**AVERY DENNISON CORPORATION,**
Plaintiff,

v.

**Jerry SUMPTON, et al., Defendants.**

**No. CV 97–407 JSL.**

United States District Court,
C.D. California.

March 16, 1998.

Lonnie Kocontes, David Quinto, Adrian Pruetz, Quinn, Emanuel, Urquhart, Oliver & Hedges, L.L.P., Los Angeles, CA, for Avery Dennison Corp.

G. Gervaise Davis, III, Davis & Schroeder, Monterey, CA, for Jerry Sumpton.

Edward Poplawski, Los Angeles, CA, for Network Solutions.

## JUDGMENT AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR TRADEMARK DILUTION

LETTS, District Judge.

Defendants are "cybersquatters," as that term has come to be commonly understood. They have registered over 12,000 internet domain names not for their own use, but rather to prevent others from using those names without defendants' consent. Like all "cybersquatters," defendants merely "squat" on their registered domain names until someone else comes along who wishes to use them. Like all "cybersquatters," defendants usurp *all* of the accepted meanings of their domain names, so as to prevent others from using the same domain names in *any* of their accepted meanings. And like all "cybersquatters," defendants seek to make a financial return by exacting a price before consenting to allow others to use the domain names on which they have chosen to "squat."

Defendants have added two new wrinkles, by which they seek to differentiate themselves from other "cybersquatters." Based upon these new wrinkles, defendants hope to avoid what has been the uniform outcome of decided cases involving disputes between "cybersquatters" and the holders of famous trademarks. *See* discussion at pages 7–8 *infra*. These wrinkles are (a) defendants allegedly have found a class of persons who are willing to pay a modest price for defendants' consent to the use of particular domain names as e-mail addresses, and (b) defendants selected the trademark domain names on which they have "squatted" by reference not to the fact that they are trademarks, but rather to the fact that they are common proper last names.

"Avery.net" and "Dennison.net" are two of the domain names that defendants have chosen to register. Plaintiff owns a number of federally registered trademarks that it uses in marketing its line of office products. These include the marks "Avery" and "Dennison." Plaintiff has brought this action alleging federal and state claims of trademark infringement, trademark dilution and unfair

competition. The parties have filed cross motions for summary judgement.

On motion for summary judgment, it is the moving party's burden to establish "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. Proc. 56(c). If the moving party carries this burden, the burden shifts to the non-movant who then "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Proc. 56(e); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

## UNCONTROVERTED FACTS

The court incorporates facts 1, 2, 6, 8, 10–14, 17, 18, 25 and 26 from plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law submitted in connection with its motion. The court determines these facts to be undisputed, and finds them as facts for purposes of decision. Additional facts stated herein for purposes of decision are also determined to be undisputed.

## CONCLUSIONS OF LAW

Because the court's conclusions of law under the Federal Trademark Dilution Act of 1995, 15 U.S.C. §§ 1125(c), 1127, (the "Act") are case-dispositive, the court will state only its conclusions under this statute.[1] The Act provides as follows:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark...."

15 U.S.C. § 1125(c)(1). The term "use in commerce" is defined for purposes of the Act as "the bona fide use of a mark in the ordinary course of trade...." 15 U.S.C. § 1127. "Dilution" is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services...." *Id.*

■ Determining whether an injunction should be issued at the behest of the holder of an allegedly famous mark to enforce the Act requires a four part analysis: (a) whether the alleged trademark is "famous," (b) whether it has been used by another person in the ordinary course of trade," (c) whether the other person's use of the mark has "lessened the ability of the mark to identify goods or services," and (d) whether the principles of equity require that the injunction be issued. 15 U.S.C. § 1125(c).

1.  *Plaintiffs marks are famous.*

■ Defendants argue that the Avery and Dennison marks are not famous. This argument is adequately disposed of by reference to the previously enumerated findings of fact. Based upon these findings, which demonstrate plaintiff's longstanding use of these marks and the degree to which these marks are recognized by individuals in the community, the court finds that the Avery and Dennison marks are famous within the meaning of § 1125(c)(1).

2.  *Defendants have engaged in a commercial use of the marks.*

Defendants do not deny that they are using the words "Avery" and "Dennison" in commerce by offering them for license as domain names. They argue instead that they are not using these words as "marks," and that, therefore, their use is not within the coverage of the Act, because to be "use[d] in the ordinary course of trade" within the meaning of 15 U.S.C. § 1127, a trademark name must be used, as such, specifically to connote its secondary meaning as a product source identification.

■ The court disagrees. The court holds that for purposes of the Act, a famous mark is "used in the ordinary course of trade" when (a) it is registered as a domain name by a registrant who is not otherwise identified by or associated with any of the commonly accepted meanings of the domain name, and (b) it is not used by the registrant as its own

---

**1.** It appears to the court that its reasoning here might lead to the same result under some or all of plaintiff's remaining claims. If this reasoning were rejected, however, it would seem likely that the alternative reasoning selected would lead to rejecting plaintiff's other claims as well.

domain name, but rather is held by the registrant for sale or license to others.

▇ Almost all words found in the dictionary have more than one meaning. To know which of the possible meanings is to be attributed to a particular word, it is necessary to know the context in which the word is used. When used in domain names, words are presented descriptively, but without other context.[2] Words used as domain names connote *all* of their commonly accepted meanings, without basis for distinguishing among them.

Defendants concede that many, if not most, of the domain names they have registered are also trademark names. Defendants' claim that they intend to license the domain names only for use as e-mail addresses, a non-trademark use, changes nothing.[3] Defendants' own use is at issue, not that of its licensees. In the hands of the defendants, without a context to limit their intended meaning, the words selected by defendants as domain names connote, and therefore use, all of the common meanings. Defendants' choice to limit the sense in which they license their domain names for use by others does not change the unlimited scope of the meanings held and used by defendants. In the cases of the Avery and Dennison domain names, these meanings included the meanings attributable to famous trademarks, and the defendants' "use" is within the coverage of the Act.

Moreover, defendants' professed licensing limitation is self-imposed. If it were established that defendants were legally entitled to force all others to deal with them if they want to use any of the 12,000 words registered by defendants as internet domain names, there would be nothing to prevent defendants from changing their allegedly intended use of the names, and simply selling or licensing them to the persons and for the

uses which would produce the highest return on invested capital. Of course, the court could attempt to limit its denial of relief so as only to apply so long as the defendants' business remained the same, but the result would almost certainly be to eliminate 12,000 words from their highest and best use as domain names.

### 3. *Dilution of the marks.*

Defendants argue that the use by their licensees of domain names as e-mail addresses does not dilute the ability of the holders of famous trademarks to identify and distinguish their products. This argument again seeks to narrow the scope of defendants' own use to the scope of use it has allowed to its licensees. It is the *defendants'* use, including but not limited to the use it allows to its licensees, that measures the alleged dilution.

Courts presented with the question have held unanimously that it does "lessen the capacity of a famous mark to identify and distinguish goods or services," when someone other than the trademark holder registers the trademark name as an internet domain name. *See Intermatic, Inc. v. Toeppen,* 947 F.Supp. 1227 (N.D.Ill.1996); *Panavision Int'l. L.P. v. Toeppen,* 945 F.Supp. 1296 (C.D.Cal.1996).

Defendants seek to distinguish these cases by arguing that, by limiting the licenses as they have, they have eliminated the dilutive effect. This argument ignores the aforementioned fact that the limitation imposed by the defendants on the manner in which their licensees use their domain names is voluntary, and may be changed at any time.

▇ In any event, the attempted distinction is unsound. To violate the Act, the use made of the mark by the alleged diluter must "lessen the capacity of a famous mark to

**2.** Defendants acknowledge that, although they selected domain name words by reference to the fact that the words are commonly used as proper last names, they do not require their licensees to use the domain names in that sense or any other particular sense.

**3.** Almost all of the words selected by defendants for registration as domain names allegedly were selected because they are common proper last names. This does not distinguish these words

from other words. Most proper last names have other meanings. Names like Carpenter, Plumber, and Foreman come readily to mind. Many, if not most, famous single-name trademarks are also proper names. Many of them, like Ford, Edison and Wrigley, are almost certainly used more commonly in their trademark sense than as proper names. Many others, like Apple, Staples and Prince are unusual proper names, but are well-understood both as ordinary words and as trademarks.

identify or distinguish goods or services." It is the registration of the trademark name as a domain name, which denies the holder of the famous trademark from using its trademark name as an internet domain name, that dilutes the ability to identify goods and services. The sale or license of the domain name to someone else for some other purpose does not eliminate the dilution.

Whether internet registration will ultimately be held to permit *any* form of this kind of preemptive squatting is not before the court.[4]

### 4. *Equity*

The Act requires more than proof that an alleged diluter has used a famous trademark in commerce, and that the effect is to dilute the capacity of the trademark to identify goods or services, to entitle the trademark holder to injunctive relief. The Act also requires the court to consider the equities as between the parties. Defendants allege that they have invested approximately $1,200,000 in their business. They allege that they are providing internet services to their licensees that the licensees could not offer for themselves, i.e., the ability to allow multiple uses of the same surnames as domain names, and the ability to spread the cost of maintaining the domain name registrations among all of the users.

Defendants also point out that their use of the ".net" designation does not deny plaintiff access to the internet through use of its trademarks as domain names. Plaintiff has registered names corresponding to its trademarks under the ".com" designation, which is the designation specified for commercial use.[5] According to the defendants, the internet registration system contemplates that the ".net" designation will be reserved for use by internet service providers, and that it will not be used for marketing of commercial products. Defendants argue that their own use of the ".net" designation is within the con-

templation of the internet registration system.

Plaintiffs contend that none of defendants' arguments is apt. They contend that the internet registration system simply does not authorize "cybersquatting." They contend that it does not authorize the registration of *any* domain names that are commonly used by others to identify themselves, not for the purpose of use by the registrant as domain names, but rather for sale or license to others.

The court agrees. This is not a case involving a dispute over a domain name between persons or entities that have previously used the name to identify themselves or their products. Defendants' claimed "service" depends on their first having preempted 12,000 domain names, so that others who customarily use a name to identify themselves can use a domain name for that purpose only with the permission of the defendants. Moreover, anyone who desires to use any of those 12,000 names for any purpose, other than as an e-mail address, is entirely precluded from doing so. In light of the fact that many of the most popular on-line services provide e-mail addresses without charge, limiting domain name registrations to this purpose is almost certainly not the highest and best use. Finally, the ".net" designation has not been preserved according to the original intent, and many registrants, including trademark holders, have registered domain names with ".net" designations that are not internet providers.

The court is extremely dubious that licensing domain names for use as e-mail addresses is defendants' true business. As previously noted, this limitation is voluntary. It would be extremely difficult to enforce if defendants' right to the exclusive use of these domain names was ever held to exist. Thereafter, it would appear that the laws of economics would require the defendants to sell or license each of their 12,000 names to

---

**4.** This case does not involve a dispute between persons or entities that have competing trademark rights. Nor does it involve a registrant whose proper name corresponds to his registered domain name. Neither the defendants nor any of their licensees have any individual color of right to the use of the names Avery or Dennison, except that derived from defendants' domain name registration.

**5.** Plaintiff has registered, among others, the "avery.com" and "averydennison.com" domain names.

the highest bidder for whatever use the buyer or licensee wished to make of them.

The information before the court, however, is insufficient for the court to conclude that defendants' alleged business is a sham as a matter of law. For that reason, the court does not conclude that defendants should be required to transfer the domain names to plaintiffs without any compensation, as has been done in other cases. *See Intermatic, Inc. v. Toeppen,* 947 F.Supp. 1227 (N.D.Ill. 1996); *Panavision Int'l. L.P. v. Toeppen,* 945 F.Supp. 1296 (C.D.Cal.1996).

■ Absent undisputed evidence that defendants' true business purpose was to preempt domain names for the purpose of selling them to the highest bidder, equity requires that defendants be paid, if they are to be required to relinquish domain names registered for a legitimate business purpose. The court has concluded that the appropriate sum is $300 for each of the names "avery.net" and "dennison.net." The evidence shows that neither of these names is a very common name, and that, to date, only one of the names has been licensed.[6] There is no evidence that the loss of these names would interfere with defendants' ability to carry on their business with domain names, if any, as to which there are no superior conflicting claims. The sum of $600 represents a return of 300% (100% per year) on defendants' original investment in these names. Were the defendants to be paid a comparable sum for all of their names, they would realize a total return of approximately $3,600,000 on an investment of approximately $1,200,000.

### ORDER AND JUDGMENT

Having reviewed the papers filed in connection with this matter, having heard oral argument, and being fully apprised of the relevant facts and law,

IT IS HEREBY ORDERED AND ADJUDGED that the motion for summary judgment of plaintiff Avery Dennison Corporation be GRANTED as to its claim of trademark dilution and that the motion of defendants Jerry Sumpton and Free View Listings, Ltd.,

for summary judgment be DENIED as to the claim of trademark dilution.

IT IS FURTHER ORDERED that defendants Jerry Sumpton and Free View Listings, Ltd., relinquish their registration of the "avery.net" and "dennison.net" domain names to plaintiff Avery Dennison Corporation.

IT IS FURTHER ORDERED that Avery Dennison Corporation pay defendants Jerry Sumpton and Free View Listings, Ltd., the sum of $600.

IT IS SO ORDERED AND ADJUDGED.

---

6. The evidence indicates that the license terms called for an initial setup fee of $20 plus a $5 per year subscription fee. Even if defendants quadruple their customer base on present terms, defendants will never recover their initial investment and will continue to lose money every year thereafter.