CHATAM INTERNATIONAL, INC.

v.

BODUM, INC.

No. CIV.A. 00–1793.

United States District Court, E.D. Pennsylvania.

Aug. 7, 2001.

Cohen, Thorp, Reed & Armstrong, LLP, Philadelphia, PA, for Defendants.

### MEMORANDUM

LUDWIG, District Judge.

In this action for violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125, trademark infringement, and trademark dilution, defendant Bodum, Inc. moves for summary judgment. Fed. R.Civ.P. 56(c).[1] Jurisdiction is federal question. 28 U.S.C. § 1331. The dispute involves competing claims for the use of the Internet domain name "Chambord"— in particular, defendant's registration and projected use of "Chambord.com." The motion will be granted, and this action will be dismissed.

### Background

Plaintiff Chatam International, Inc., through its wholly owned subsidiary, Charles Jacquin et Cie., Inc., sells a raspberry liqueur as well as fruit preserves under the trademark "Chambord." Pltf. mem. at 4. Plaintiff also licenses the distribution of milk chocolate and cake under the Chambord mark. *Id.* October 31, 1975, is the date on which it first used the mark "Chambord Liqueur Royale" commercially. Pltf. exh. C. On February 8, 1977, it registered the mark "Chambord Liqueur Royale" with the U.S. Patent and Trademark Office, and the trademark certificate itself states that it "expressly asserted no claim" to the individual word "Chambord." *Id.* However, in 1984, it registered the mark "Chambord" for liqueur and for milk chocolate and, in 1986 and 1988, for fruit preserves and cake. *Id.*

Joshua Sarner, Sarner and Associates, Philadelphia, PA, Paul M. Lewis, Dilworth, Paxson LLP,Philadelphia, PA, Arthur H. Seidel, Drinker, Biddle & Reath LLP, Philadelphia, PA, for Plaintiff.

David E. Bennett, Michael J. Turgeon, Chad A. Scheifelbein, Vedder, Price, Kaufman & Kammholz, Chicago, IL, Barry L.

---

**1.** Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The movant must show that there is no triable issue of fact. The nonmovant having the burden of proof at trial must point to affirmative evidence in the record— and not simply rely on allegations or denials in the pleading in order to defeat a properly supported motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Crissman v. Dover Downs Entertainment, Inc.,* 239 F.3d 357, 360–61 (3d Cir.2001).

As of 1981, Bon Jour Imports Corporation, defendant's predecessor in interest, sold French-press coffee makers under the mark "Cafetiere Chambord" and coffee under the mark "Café Chambord Coffee." Joint submission ¶ 24.[2] In that year, plaintiff instituted a trademark infringement action against Bon Jour in this court, which eventually was terminated by a consent decree. *Id.* ¶¶ 25–26, 29; *Chatam International Inc. v. Bon Jour Imports,* Civ. A. No. 81–5185 (E.D.Pa. March 11, 1982). The decree prohibited Bonjour's use of the mark "Café Chambord Coffee" for the sale of coffee as unfair competition, but accorded defendant the "right to continue to use the mark 'Chambord' in connection with the sale and offering for sale of coffee makers."[3] Joint submission ¶¶ 29–31; pltf. exh. H(B). On May 17, 1983, defendant registered the mark "Cafetiere Chambord" for non-electric coffee makers, noting that commercial use had first occurred on September 8, 1980. Joint submission ¶ 33. On March 19, 1991, it registered "Chambord" for non-electric coffee makers, also dating the first commercial use back to 1980. *Id.* ¶ 36.

On November 6, 1996, PI Design AG, an affiliate of defendant, registered the domain name[4] "Chambord.com" with Network Solutions.[5] Joint submission ¶ 42. Pltf. exh. I. The website[6] consists of ad-

**2.** The parties submitted a joint statement of agreed facts dated November 14, 2000.

**3.** According to plaintiff, the consent decree did not allow Bon Jour to use "Chambord" by itself, but only as part of "Cafetiere Chambord." Oral arg., June 21, 2001, at 16. The consent decree initially states: "The use of the mark 'Cafetiere Chambord' in connection with the sale or advertising of the sale, would not infringe the rights of the plaintiff in any respect." *Id.* ¶¶ 29–31; pltf. exh. H(B). By implication, plaintiff contends, the free-standing use of "Chambord" in regard to defendant's coffee makers is impermissible—although in a later reference the decree seems to say the contrary. In any event, defendant and its predecessor have been using the single word "Chambord" for a line of coffee makers since 1980, without constraint.

**4.** "A domain name is a way to identify and locate computers and resources connected to the Internet. No two organizations can have the same domain name." http://www.whois.net/whatdom.html (August 2, 2001). "A domain name tells users where they can find a particular web page, much like a street address tells people where they can find a particular home or business." *Virtual Works, Inc. v. Volkswagen of America, Inc.,* 238 F.3d 264, 266 (4th Cir.2001).

**5.** Network Solutions is one of a number of agencies licensed to register and disseminate new domain names by the Internet Corporation for Assigned Names and Numbers (ICANN), a nonprofit corporation recognized by the U.S. Department of Commerce and certain foreign governments to, coordinate the technical management of the Internet's domain name system. http://www.icann.org/general/fact-sheet.htm (August 2, 2001).

Plaintiff has registered the domain names "ChambordOnline.com," "Chambord.net," and "ChambordLiqueur.com." Joint submission ¶ 47. ChambordOnline.com is a website for Chambord Liqueur. *Id.* ¶¶ 48–50. The site is limited to users over age 21, and the liqueur itself is not sold over the Internet. *Id.; see infra* note 13. The name "Chambord.org" is registered by Mmsa of Paris, France for the French chateau of the same name. Joint submission ¶ 55.

**6.** The website has been accessible to those who know its Internet Protocol address, not to the general public. Every "domain name corresponds to numeric IP (Internet Protocol) addresses. An IP address takes the form of 4 numbers, each one between 0 and 255, separated by periods. The Internet uses the numeric IP address to send data. For instance, you may be connecting to a World Wide Web server with the domain name 'rs.internic.net,' but as far as the network is concerned, you are connecting to the Web server with the IP address associated with that domain name. The Domain Name System completes the task of matching domain names to IP (Internet Protocol) addresses."

vertisements of defendant's Chambord line of coffee and tea makers, and a link to the website located at Bodum.com. Pltf. exh. H(F). The latter website, in addition to advertising, contains offers to sell various housewares, including Chambord coffee and tea makers and Bodum tea. *See* http://www.bodum.com/ (August 2, 2001). Coffee is not advertised for sale at either site. *Id.*

## I. Anticybersquatting Consumer Protection Act

 On November 29, 1999, the Anticybersquatting Consumer Protection Act, which amended the Lanham Act, became law. 15 U.S.C. § 1125(d). Under the Act, it is illegal to register a domain name that is the subject of trademark protection; and a private cause of action is created for "cyberpiracy." [7] The Act's predicate is bad faith. *Id.* The statute lists factors to be considered in determining bad faith. These include: the registrant's trademark or other intellectual property rights in the domain name; its prior use of the name for the bona fide offering of goods or services; its intent to divert consumers from the mark owner's online location; its offer, if any, to sell the domain name for financial gain without having used, or intended to use, the domain name for the bona fide offering of any goods or services; its having given false or misleading identifying information when registering the name; its registration of other domain names that are confusingly similar to other distinctive marks; and the fame of the owner's mark. 15 U.S.C. § 1125(d)(1)(B)(i). *See also Shields v. Zuccarini,* 254 F.3d 476 (3d Cir.2001) (finding bad faith); *Northern Light Technology v. Northern Lights Club,* 236 F.3d 57 (1st Cir.2001), *cert. denied,* —— U.S. ——, 121 S.Ct. 2263, 150 L.Ed.2d 247 (2001) (finding bad faith in light of numerous domain name registrations, disregarding cease and desist letters, and offering to sell the domain name "at the right price").

The statute demarcates a safe harbor: "Bad faith intent . . . shall not be found in any case in which the court determines that the [registrant] believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

---

http://www.whois.net/whatdom.html (August 2, 2001).

Although the site for Chambord.com has been built, it has not been connected to the domain name, pending this litigation. For a time it was available at the IP address http:// 212.59.148.138. Def. exh. H(F).

7. "Cyberpiracy" may be described as the registration of a domain name of another's mark for the primary purpose of selling the domain to the mark owner for an extortionate sum of money. In some instances not amounting to piracy of another's name, the registrations are more akin to playing the lottery. *See Truck Driver Hopes to Hit it Rich with Web Names,* Philadelphia Inquirer, July 26, 2001.

Under the Act:
(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
(ii) registers, traffics in, or uses a domain name that—
(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
(II) in the case of a famous mark that is famous at the time of the registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.
15 U.S.C. § 1125(d)(1)(A).

Here, as of 1991, defendant Bodum, Inc. obtained a valid, subsisting trademark of the name "Chambord" relative to non-electric coffee makers. Joint submission ¶¶ 36–37. The 1982 consent decree can also be read to have authorized the use of the mark for that purpose, *id.* ¶¶ 29–31; and the proposed site for Chambord.com is confined to the sales and advertising of coffee and tea makers. http://212.59.148.138. There is no evidence that defendant misrepresented itself in the registration of the domain name, or that it registered other confusing domain names. Under the Act, a triable issue of bad faith would be speculative and remote with little support in Rule 56 proffers.[8] While defendant's use of "Chambord" is limited to a line of products and to a particular model, or type, within that line, plaintiff's use of the same name is also attached to particular products. The Act does not differentiate between categories of goods and services or the various applications or uses of a trade name. If anything, defendant appears to be exculpated from cyberpiracy on the basis that it reasonably believed the use of the name "was fair ... or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii); *see e.g., Hartog & Co. AS v. SWIX.com,* 136 F.Supp.2d 531, 542 (E.D.Va.2001) (finding no ACPA bad faith violation where defendant operated a legitimate business at the website and had some Swiss trademark rights to the name).

As structured, the Act leaves open the present combination of circumstances—in which both parties can invoke legitimate grounds for the registration of the same domain name for their respective products.[9] The Act could have required the sharing of a website directory screen for this kind of same-name situation, with links to each of the individual registrant's websites, but it did not do so.

## II. Federal and State Trademark Infringement and Unfair Competition

The elements of trademark infringement are (1) the mark is valid and legally protectable; (2) the ownership of the mark by plaintiff; and (3) defendant's use of the mark to identify goods or services is likely to produce confusion as to the origin of the goods or services. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 210 (3d Cir. 2000); *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 472 (3d Cir. 1994). Likelihood-of-confusion is the essence of federal and Pennsylvania trademark infringement as well as unfair competition. *A & H Sportswear,* 237 F.3d at 210 ("We measure federal trademark in-

---

**8.** Plaintiff makes three bad faith arguments: (1) at the time of the registration of Chambord.com, defendant's rights to the domain name were not clear; (2) defendant's expansion of its use of the mark Chambord over the years since the consent decree suggests predatory intent; and (3) defendant's registration of Chambord.com after plaintiff's mark became famous and before defendant registered Bodum.com, demonstrates intent to divert consumers searching for plaintiff's product. Pltf. mem. at 39. While the 1982 consent decree may not itself entitle defendant to the domain name Chambord.com, having not been entered into in anticipation of the Internet, it tends to negate bad faith.

**9.** As a practical matter, an Internet user who intended to access either of the party's products, but who had not done so before, could go to a search engine or—on America Online, to Keyword. The dispute in this case is primarily focused on the status and prestige associated with having a dot-com website. Neither party is willing to agree to a shared or split "Chambord.com" screen that would allow a user to have immediate linkage to either one product or the other. Public interests, such as convenience and reduction of confusion, have been subordinated by the parties to their private concerns, which in this controversy may turn out to be largely symbolic.

fringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by identical standards."); *Fisons*, 30 F.3d at 473 (likelihood-of-confusion is the test under both the trademark infringement and unfair competition sections of the Lanham Act); *Patient Transfer Systems, Inc. v. Patient Handling Solutions, Inc.*, 1999 WL 54568, *4 (E.D.Pa. Jan.29, 1999) (Pennsylvania unfair competition and trademark infringement have the same elements as Lanham Act violations except that goods need not have traveled in interstate commerce) (citing *Fisons*).

■■■ Where, as here, both parties have legally protectable marks but the products are non-competing, our Court of Appeals has formulated the following non-exhaustive, 10–factor inquiry as to likelihood-of-confusion: [10]

(1) degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of commerce and advertised through the same media;

(8) the extent to which the targets of the parties sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of similarity of function; and

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that [it] is likely to expand into that market.

*Fisons*, 30 F.3d at 473 (from *Interpace Corp. v. Lapp, Inc.* 721 F.2d 460, 463 (3d Cir.1983)); *see also A & H Sportswear*, 237 F.3d at 211.

Some of these so-called *Lapp* test factors can be examined in this case using conventional, pre-Internet analysis. For example, the price of a .750 liter bottle of Chambord Liqueur and of a Chambord coffee maker are each less than $45. *See* Pa. State Liquor Store pricelist; http://www.bodum.com/ (August 2, 2001). However, both of these instances of product selection involve personal taste, so customers would be likely to be discriminating. As to factor (5), defendant's intent in adopting the mark, there is no genuine evidence that defendant acted in bad faith. *See* Part I, *supra*.

Factors (9) and (10), referable to consumers' expectations, look to the parties' relational and product history. Coffee as a beverage may be associated in some minds with liqueur; and plaintiff conceivably might market a line of coffee designed to be served, or flavored with, Chambord Liqueur. However, the 1982 consent decree restrained defendant from continuing to sell coffee under the Chambord name, and there is no evidence that it intends to sell or otherwise market coffee, as distinguished from coffee makers, on Chambord.com, or any site—to which it is

**10.** Proof of actual confusion is unnecessary upon proof of likelihood of confusion. *Fi-*

*sons,* 30 F.3d at 476.

linked.[11] Under the consent decree, the interdiction between liqueur and coffee is not extended to liqueur and coffee makers. A consumer would be unlikely to associate a liqueur and a housewares product or expect plaintiff to enlarge its business to include coffee and tea makers. Moreover, the commercial styles and approaches employed by the parties are substantially different. Plaintiff's advertising appeals to romance and elegance. Pltf. exh. D. Defendant's emphasizes functionality and contemporary design. Pltf. exh. J.

■ Other *Lapp* factors are not particularly helpful given the special and novel constraints of this action.[12] Not only do the parties have valid and incontestable ownership rights in the same mark (factors (1) and (2)),[13] but they also have been using the mark in parallel for more than 20 years without actual confusion (factors (4) and (6)). The subject of the 1982 consent decree has not, until now, become involved in further court proceedings. As to factor (4)—the time period of lack of actual confusion—the inception date according to plaintiff should be the use of the website, not the use of the mark Chambord itself. Pltf. mem. at 16. Plaintiff posits that the technology of the Internet removes defendant's use of the mark from what was contemplated by the consent decree and results in infringement and the prospect of actual confusion. *Reno v. ACLU*, 521 U.S. 844, 850, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("The Internet is a unique and wholly new medium of world-wide communication."). While the technical indivisibility of a domain name under current Internet protocol may produce some confusion by excluding an owner of the same mark, such as Chatam in this case, the *Lapp* test factors—and the Anti-cybersquatting statute—do not relate to this predicament or attempt to resolve it.

Moreover, the traditional approaches to factors (7) and (8)—channels of trade, similar advertising media, and consumer targets—are also distorted by the modality of the Internet, both generally and as applied to this case. If the Internet is viewed as a single universe of trade or advertising media, with a prodigious commercial value of its own, these factors point toward product confusion. If the Internet is seen, simply, as an overlay on the global marketplace without materially affecting its existing divisions, these factors are either neutral or tilt the other way. Unquestionably, the Internet and its domain names are a huge independent marketing force that has had remarkable and unforetold ramifications. *Cf. New York Times Co. v. Tasini*, —— U.S. ——, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001) (articles republished in electronic

**11.** According to plaintiff, the text "Chambord Coffee" on the Chambord.com and Bodum.com sites is a violation of the consent decree. Pltf. mem. at note 9. However, the site itself makes clear that the text "Chambord Coffee" refers only to coffee makers, not to coffee itself. http://212.59.148.138/ (June 6, 2001). Even so, if there were an ambiguity, it could be resolved without bearing on the outcome of this case.

**12.** "[T]he *Lapp* test is a qualitative inquiry. Not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting. A district court should utilize the factors that seem appropriate to a given situation." *A & H Sportswear*, 237 F.3d 198 at 215.

**13.** There are a number of Internet websites using the name "Chambord" that are registered to others than the present litigants: Chambord.org, Amis–de–Chambord.org, Chambord–Tech.com, ChambordCountry.com, ChambordGroup.com, Chambord-Newport.com, Chateau–Chambord.com, ChambordPrestige.com, Le–Grand–Chambord.com, Chambord–Investissment.com, OreedeChambord.com. Joint Submission ¶¶ 55–66.

databases are not part of or revisions of periodicals and cannot be relicensed by periodical publishers without authors' consent). However, the Internet is not the sole commercial outlet, or window, for either of these parties, but instead is in addition to broad advertising and sales activities in other media. *See Hasbro, Inc. v. Clue Computing, Inc.,* 66 F.Supp.2d 117, 123 (D.Mass.1999), *aff'd* 232 F.3d 1 (1st Cir.2000) (In a domain name dispute, "[w]here products have some overlap in channels of advertising and trade but primarily occupy different channels, courts have not found likelihood of confusion based on this factor."). Here, plaintiff has stipulated that its liqueur will not be sold on the Internet. Joint submission ¶ 50.[14]

*Lapp* factor analysis, while instructive, is not itself enough. The question remains whether defendant's registration of Chambord, as a domain name in an unrestricted generic top level domain (TLD),[15] creates a substantial likelihood of non-preexisting confusion. In trademark law, the technicalities of Internet addresses still have little, if any, importance. The U.S. Patent and Trademark Office notes that when a trademark "is composed, in whole or in part, of a domain name, neither the beginning of the [Uniform Resource Locator] (http://www.) nor the TLD have any source indicating significance. Instead, those designations are merely devices that every

Internet site provider must use as part of its address." The Patent and Trademark Office Examination Guide No. 2–99 (Sept. 29, 1999). *See also Brookfield Communications v. West Coast,* 174 F.3d 1036, 1055 (9th Cir.1999) (addition of ".com" to a mark has no trademark significance). If ".com" then does not really matter in the formulation of a trademark, what is left as a legal issue is the effect on the public and the marketplace of the initial and exclusive access to defendant's products—as well as the potential for dilutional effect on plaintiff's mark. These issues involve consideration of what has become known by the rubric "initial interest confusion." Initial interest confusion, factually and legally, is the gravamen of this case and of the broader problems presented by the exclusivity of domain names.

 Traditional confusion analysis focuses on post-sale consequences—in which the customer is likely to be confused about the source of goods even after they have been purchased. However, pre-sale confusion, involving initial interest, has also been recognized. *See, e.g., Dr. Seuss Enters. v. Penguin Books USA,* 109 F.3d 1394, 1405 (9th Cir.1997); *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 257–58 (2d Cir.1987); *see also* 3 McCarthy on Trademark and Unfair Competition § 23:6 (4th ed.2000). "Infringement can be

---

14. There are other websites that sell alcohol, albeit subject to limitations imposed by law. Certain states prohibit shipping alcohol over state lines, primarily for tax reasons. *See generally* Vijay Shanker, *Alcohol Direct Shipment Laws, the Commerce Clause, and the Twenty–First Amendment,* 85 Va.L.Rev. 353 (1999).

15. A TLD, or ending of a website address, refers to the source path for the domain. At present there are three unrestricted generic TLDs. They are 'com,' 'net,' and 'org.' Other current TLDs have restrictions and cannot be registered by the public at large. *E.g.,* 'gov' is

reserved for offices of the U.S. government. Seven new generic TLDs have recently been approved by ICANN. These include 'info,' which will be unrestricted, and 'biz,' which will be restricted to businesses. Both dot-biz and dot-info will have special registration periods for trademark owners. A dispute such as this one, between parties having trademark rights, will be subject to a dispute resolution procedure as a prerequisite to litigation. http://www.internic.net/faqs/new-tlds.html ( August 3, 2001). Administrative control of that type could possibly have prevented the present litigation.

based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion." McCarthy § 23:6. Initial interest confusion "permits a finding of a likelihood of confusion although the consumer quickly becomes aware of the source's actual identity." *Interstellar Starship Services, Ltd. v. Epix Inc.,* 184 F.3d 1107, 1110 (9th Cir.1999).

 While our Court of Appeals has not yet delved into initial interest confusion, several courts in this circuit have done so, though not in the context of the Internet. *See, e.g., Sunquest Information Systems, Inc. v. Park City Solutions, Inc.,* 130 F.Supp.2d 680, 695–97 (W.D.Pa.2000); *Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.,* 104 F.Supp.2d 427, 461–65 (D.N.J.2000). Generally, initial interest confusion is of greatest concern when products are in competition with each other—in those instances, customers may be drawn to a product and identify it with a particular source without realizing until later that it came from elsewhere. *See, e.g., Brookfield,* 174 F.3d at 1056–57. Where companies "are non-competitors, initial interest confusion does not have the same consequence, because there is no substituted product to buy from the junior user, and the senior user does not bear the prospect of harm." *Checkpoint Systems,* 104 F.Supp. at 462. "Initial interest confusion can be viewed as a variation on the practice of the 'bait and switch.'" McCarthy § 23:6. Obviously, it can also be a means of taking advantage of another's well known name.

Five reported decisions in other circuits have discussed initial interest confusion in terms of the extent and effect of product differential. In *Hasbro, supra,* the makers of the board game CLUE objected to the registration and use of "clue.com" by Clue Computing, a computer consulting service. The district court adjudication, in reasoning adopted on appeal, underscored the unlikelihood of confusing a board game with computer consulting. "[T]he kind of confusion that is … likely to result from Clue Computing's use of the 'clue.com' domain name—namely, that consumers will realize they are at the wrong site and go to an Internet search engine to find the right one—is not substantial enough to be legally significant." *Id.* at 125. It concluded that "although the need to search for Hasbro's site may rise to the level of inconvenience, it is not sufficient to raise a dispute as to actual confusion." *Id.*

In another Internet case, the Ninth Circuit Court of Appeals also emphasized competitive dissimilarity in assessing plaintiff's ultimate chances of prevailing on the theory of initial interest confusion. "If [the parties] did not compete to any extent whatsoever, the likelihood of confusion would probably be remote." *Brookfield,* 174 F.3d at 1056.[16] Applying *Brookfield,* to facts somewhat similar to this case, a district court decision analyzed:

> Dissimilarity of goods and services resolves the initial interest confusion question. A trademark violation based upon initial interest confusion involves the junior user capitalizing on the senior user's goodwill. The senior user's customers, at least tangentially in the market for the junior user's services, accidentally access the infringing site while in search of information on the senior user's products. Thus, relatedness of products is an important component in

---

**16.** *See also Interstellar Starship Services,* 184 F.3d at 1111 (issues of fact existed whether epix.com infringed on the mark EPIX where both parties intended to expand into the areas of computer graphics).

the analysis, even if the products need not be closely related.

*The Network Network v. CBS Inc.*, 54 U.S.P.Q.2d 1150, 1157–58, 2000 WL 362016 (C.D.Cal.2000). There, after registering "tnn.com," a computer consulting firm sued CBS, the owner of The Nashville Network—also "TNN"—a popular country music cable television station. Its requests for declaratory judgments of non-infringement and non-dilution were granted in part because there "is a difference between inadvertently landing on a website and being confused." *Id.* at 1155.[17]

Here, a consumer attempting to access an upscale liqueur product is unlikely to be dissuaded, or unnerved, by the sight of coffee makers and other housewares, having first brought up the coffee maker's screen. *See e.g., Checkpoint Systems*, 104 F.Supp. at 462 (finding no initial interest confusion between Checkpoint Systems, which distributes corporate and retail security systems and Check Point Software, which sells computer information security systems). As *The Network Network* elucidates, Internet surfers are inured to the false starts and excursions awaiting them in this evolving medium. And while more governmental and industry-driven regulation could make it easier on the public, what this case may represent is that the traditional commercial advantage of getting out ahead at the front of the marketplace is not confined to competitive products. In this sense, the Internet, in its presently exclusive construct, is itself a form of product—and more regulatory protection may well be advisable.

### III. Trademark Dilution

In 1996, the Federal Trademark Dilution Act was enacted to safeguard famous trademarks from the attenuation resulting from unauthorized use. 15 U.S.C. § 1125; *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 162–3 (3d Cir.2000) (citing McCarthy § 24:70). Under the Act:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark.

15 U.S.C. § 1125(c)(1). The term "dilution" is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services regardless of the presence or absence of (1) competition . . . or (2) likelihood of confusion, mistake, or deception." *Id.* at § 1127.

A prima facie claim of statutory dilution consists of proof that—

1. The plaintiff is the owner of a mark that qualifies as a 'famous' mark in light of the totality of eight factors listed in § 1125(c)(1),

2. The defendant is making commercial use in interstate commerce of a mark or trade name,

3. Defendant's use began after the plaintiff's mark became famous, and

---

17. The decision continues:

Thousands of Internet users every day take a stab at what they think is the most likely domain name for a particular website. Given the limited number of letters in the alphabet, and the tendency toward the use of abbreviations in commerce generally and in domain names in particular, it is inevit-

able that consumers will often guess wrong. But the fact that aficionados of The Nashville Network may initially type 'tnn.com' into their browsers in the hope of locating Grand Ole Opry programming information does not, standing alone, demonstrate confusion.

*The Network Network*, 54 U.S.P.Q.2d at 1155.

4. Defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.

*Times Mirror*, 212 F.3d at 163. Neither bad faith nor likelihood of confusion has to be established. 15 U.S.C. § 1125(c)(1).

Here, the dispute centers on timing—as to when Chambord allegedly became a famous mark as to liqueur as against defendant's first commercial use. The statutory requirement that a defendant's use must occur after plaintiff's mark became famous "reflects the fair and equitable principle that one should not be liable for dilution by use of a mark which was legal when first used." McCarthy § 24:96. A plaintiff must supply "evidence and proof of the timing of two events: when the plaintiff's mark achieved that elevated status called 'fame' and when the defendant made its first use of the mark." *Id.*

Here, the question of when defendant's use of the mark began is comparatively convoluted both as to the accrual date of the use and the scope of the use. Bodum has been using "Chambord" since 1980—and since 1982 via the consent decree—for its line of coffee makers. The issue as articulated by plaintiff is whether the Internet registration and use of "Chambord.com" constitutes a new and different use that arose after plaintiff's mark purportedly became famous.[18] The statute speaks of dilutional use from the standpoint of "commercial use in commerce" and of "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not merely to reserve a right in a mark." 15 U.S.C. §§ 1125(c), 1127. The mark may be "placed in any manner on the goods or their containers or the displays associated therewith...." *Id.* No distinction is made between types of use in commerce. What persists is whether the exclusive and unrestricted use of a World Wide Web address, or domain name, is different in kind and in legal effect from defendant's previous use in commerce, which was limited to coffee makers.

The decision in *The Network Network* observed "that the statute looks to the mark's fame at the time of the mark's first commercial use, not when the first use occurs that the mark's owner finds objectionable. Indeed, if this latter formulation were the rule, the requirement that infringing use begin after the mark becomes famous would be stripped of all meaning." 54 U.S.P.Q. at 1153. While there may be appeal to the argument that the operative date should be the registration of the domain name, that rule would be unworkable. It would give owners "of famous marks the authority to decide when an allegedly diluting use was objectionable, regardless of when the party accused of diluting first began to use the mark." *Id.* The length of concurrent usage under the consent decree reflects that the marketing of coffee makers did not previously dilute the value of the trademark of the liqueur. *See, e.g., id.* Defendant's use for some 16 years before its registration of Chambord.com, satisfies the definition of "use in commerce."

As plaintiff contends, the Internet is a new technology not contemplated by the consent decree, but that does not equate

---

**18.** The possibility that the registration of a famous mark as a domain name is a per se dilution has been considered. *See e.g., Avery Dennison Corp. v. Sumpton,* 999 F.Supp. 1337, 1340–41 (C.D.Cal.1998). *Hasbro* rejected this argument with regard to a legitimate competing use. "If another Internet user has an innocent and legitimate reason for using the famous mark as a domain name and is the first to register it, that user should be able to use the domain name, provided it has not otherwise infringed upon or diluted the trademark." 66 F.Supp.2d 117, 133.

with a new use in commerce. The Internet is a new universe of communication, not of use. The consent decree is silent as to advertising, types of media, or approaches to marketing. Inferentially, the U.S. Patent Office's statement that the TLD does not have any "source indicating significance" can be taken to mean that the mark Chambord.com is not legally distinct from the mark Chambord—no doubt a sensible view.

Almost all of the evidence of the fame of plaintiff's product post-dates defendant's first use of the mark "Chambord." Pltf. exh. D. It is unclear whether the Federal Trademark Dilution Act of 1995 is to be applied retroactively. *See generally* McCarthy § 24:98.1. Given the result in this case, that issue need not be reached. It has been said that "[h]olders of a famous mark are not automatically entitled to use that mark as their domain name; trademark law does not support such a monopoly." *Hasbro*, 66 F.Supp.2d 117, 133, *aff'd* 232 F.3d 1. The loser, if any, in this cyberspace technology dispute, is the public. It is hard to say that the loss will be a substantial one, or that the time-honored entrepreneurial one-upmanship of first-to-the-trough, will make much of a difference in this case.

An appropriate order follows.

### ORDER

AND NOW, this 7th day of August, 2001, defendant Bodum Inc.'s motion for summary judgment is granted, Fed. R.Civ.P. 56(c), and this action is dismissed.