**PENNSYLVANIA BUSINESS BANK, Plaintiff,**

v.

**BIZ BANK CORP., and Daemin Won, Defendants.**

**Civil Action No. 01–2529.**

United States District Court, E.D. Pennsylvania.

Aug. 6, 2004.

Jeffrey L. Eichen, Venable, LLP, Washington, DC, for Plaintiff.

## MEMORANDUM

DuBOIS, District Judge.

## I. INTRODUCTION

This case arises out of a dispute between the Pennsylvania Business Bank and Biz Bank Corp, a South Korean company, and a South Korean citizen affiliated with Biz Bank Corp., Daemon Won, over the internet web address <http://www.bizbank.com>. The gravamen of plaintiff's claims are that defendant's website at <http://www.bizbank.com> infringes plaintiff's trademark and constitutes cybersquatting. Defendants have proceeded *pro se* from Korea since the commencement of the litigation.[1] In recognition of this fact, and defendants limited command of English, the Court has taken extraordinary steps to ensure the fairness of the proceedings. These procedures are summarized in Section II *infra*.

## II. PROCEDURAL HISTORY

Plaintiff Pennsylvania Business Bank filed a three-count Complaint against Defendants Biz Bank and Daemon Won (collectively "the defendants") on May 22, 2001: Count I alleges infringement of a federally registered trademark in violation of 15 U.S.C. § 1114; Count II alleges infringement of an unregistered trademark and unfair competition in violation of 15 U.S.C. § 1125; and Count III alleges violations of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).

---

1. The individual defendants, Daemin Won, is permitted to appear *pro se*, but the corporate defendant cannot do so. *U.S. v. Cocivera*, 104 F.3d 566, 572 (3d Cir.1996) (a corporation may not be represented by other than licensed counsel). The individual defendant, who is not an attorney, may not represent defendant, Biz Bank Corp. Thus, the Court would have been justified in entering a default judgment against defendant, Biz Bank Corp. However, because the issues are identical with respect to both defendants, the Court did not do so and instead reviewed all of the submissions of both defendants (they were all joint submissions) and decided the case on the merits.

On May 22, 2001, plaintiff filed a Motion Regarding Service of Summons and Complaint (Docket No. 2, filed June 22, 2001) pursuant to Federal Rule of Civil Procedure 4(f)(3) requesting leave to serve defendants in Korea by delivery of the Summons and Complaint through commercial international overnight delivery service. In that motion plaintiff stated it would translate the Complaint and Summons into Korean and serve defendants by two independent means—commercial overnight delivery service and international certified mail, return receipt requested. The Court granted the motion by Order dated May 24, 2001 and directed that the Complaint and Summons be translated into Korean and the two proposed means of service be utilized. Plaintiff complied with the Court's Order and defendants were properly served.

On July 23, 2001, plaintiff filed a Request for Entry of Default by the Clerk of Court pursuant to Federal Rule of Civil Procedure 55(a) and a Motion for Entry of Judgment by Default on the ground that defendants failed to plead or otherwise defend the case. A default was entered by the Clerk on July 23, 2001 pursuant to the request. On August 23, 2001, the Court received a letter from defendants entitled "Reply" in which defendants denied plaintiffs allegations. Treating defendants letter as an answer, the Court, by Order dated September 17, 2001, denied plaintiff's motion for judgment by default and set aside the default. Also in that Order, the Court directed defendants to obtain the services of an attorney or run the risk that the relief sought by plaintiff against it would be granted.

On October 9, 2001, plaintiff filed a motion for summary judgment. In a letter to the Court dated November 1, 2001, filed November 16, 2001, defendants requested that the Court order plaintiff to translate its motion for summary judgment into Korean. Plaintiff objected to defendants' request. By Order dated November 28, 2001, the Court granted defendants' request. Plaintiff then translated its motion for summary judgment into Korean and provided the translation to defendants. In response, defendants sent the Court a series of letters arguing the merits of plaintiff's motion, all of which were filed, and plaintiff filed several formal replies. The Court denied plaintiff's motion for summary judgment by Order dated July 15, 2002.

In a letter to the Court for trial other than by live, in-court testimony dated September 5, 2002, defendants requested that the Court "... change the method of trial to final Judgment of Jan E. DuBois, J., without other procedure or another simple trial or brief trial method ..." By Order dated September 9, 2002, the Court directed plaintiff to respond to defendants' request. Plaintiff filed a Memorandum in Opposition to Defendants' Motion for Summary Judgment and Trial Other Than By Live, In–Court Testimony on September 23, 2002. In its opposition, plaintiff offered to waive its right to a jury trial and proposed a procedure for conducting a bench trial without live testimony or other live proceedings.[2] Based on the suggestions of the parties, the Court by order dated November 6, 2003, directed the parties to simultaneously submit all evidence in support of their respective positions through sworn affidavits and documents; submit written cross-examination questions to the opposing party thereafter; provide written answers to the cross-examination questions in the

---

2. In a letter dated October 1, 2001, defendants "ask eagerly that Judge Jan e. DuBois, J. consider Final Decision directly, without any other procedure or Final Decision by submitting final summary of statement."

form of sworn affidavits and documents; and file proposed findings of fact and conclusions of law. Plaintiff complied with this procedure and submitted evidence and ultimately proposed findings of fact and conclusions of law. Defendants submitted evidence in accordance with the Court's Order but presented no other documents.

The Court has reviewed all submissions of the parties and makes the following findings of fact and conclusions of law.

## III. FINDINGS OF FACT

1. Plaintiff Pennsylvania Business Bank is a state-chartered bank duly formed and validly existing under the laws of the Commonwealth of Pennsylvania, with its executive offices located at 1401 Walnut Street, Philadelphia, PA 19102. Affidavit of Ethan S. Fellheimer in Support of Summary Judgment ¶ 2 ("Fellheimer Affidavit").

2. The mark "BIZBANK" was originally used in commerce and registered by the Don Freeman Group, Ltd. ("DFG"). DFG filed its application for federal registration on March 30, 1990, in International Classes 35 (business management consultation services) and 36 (financial analysis and consulting services). The United States Patent and Trademark Office ("PTO") registered the mark on May 28, 1991. The date of the first use shown on DFG's application is October 19, 1989. The mark was renewed through May 28, 2011. Fellheimer Affidavit ¶ 3 and Exhibit A.

3. As shown on the PTO federal trademark registration, the BIZBANK mark is incontestable under 17 U.S.C. § 1065. Fellheimer Affidavit ¶ 3.

4. On April 2, 2001, DFG assigned to plaintiff all right, title and interest in and to the BIZBANK mark, together with the goodwill of the business symbolized by the mark, the federal registration of the mark, all right to damages arising out of past infringement of the mark and the right to sue for and recover the same. Plaintiff recorded this assignment with the PTO Assignment Division on April 10, 2001. Fellheimer Affidavit ¶ 4.

5. In the assignment document, DFG, through its president Donald Freeman, also represented and warranted that DFG first used the mark in interstate commerce on the date of first use shown in the trademark application (October 19, 1989) and that DFG had never discontinued its use with an intent not to resume it. Fellheimer Affidavit ¶ 5.

■ 6. BIZBANK is a descriptive mark with a secondary meaning. The word "bank" is a generic term. The Court takes judicial notice, pursuant to Federal Rule of Evidence 201, that the word "biz" is a widely understood colloquial term for the word "business". The two words together suggest the user is an entity in the business of banking, which accurately describes the services plaintiff provides. However, the secondary meaning is that the user provides banking services specifically tailored to the needs of businesses, as opposed to individuals.

7. Others have acknowledged plaintiff's ownership of the mark. The BIZBANK mark has been in use in the United States for over ten years, and its customers and vendors know of the mark BIZBANK as indicating Pennsylvania Business Bank's identity and services. Fellheimer Affidavit ¶ 12.

8. On July 31, 2001, plaintiff entered into a non-exclusive license agreement with Cambridge Trust company in which Cambridge Trust acknowledged plaintiffs ownership of the BIZBANK mark, paid plaintiff a royalty for its use of the mark and submitted for plaintiff's approval any materials containing the mark. Fellheimer Affidavit ¶ 6.

9. Defendant Biz Bank is a corporation formed and existing under the laws of South Korea, with its headquarters and principal place of business located at # 415, Hanshin Building, 136–1 Mapo-dong, Mapo-gu Seoul 121–736, Korea. Fellheimer Affidavit ¶ 7

10. Biz Bank is listed as the entity operating the web site with the domain name of <http://www.bizbank.com>. Fellheimer Affidavit ¶ 7.

11. Defendant Daemin Won is an individual residing in Korea at the same address as Biz Bank and is either an officer or owner of Biz Bank. Fellheimer Affidavit ¶ 7.

12. Defendant Won is listed as the registered owner of the domain name <http://www.bizbank.com>. Fellheimer Affidavit ¶ 7.

13. At the time plaintiff filed its Complaint, defendants Biz Bank and Won (collectively "defendants") displayed the following content on the web site:

> We are one of the leading company [sic] of several kinds of Korean products and also do our best to support our customers . . .
> We always do our best to supply ordered products with Best Quality, Competitive Price and Shortest Delivery.
> Exporter–Biz Bank Corp. export [sic] many kinds of Korean products. We offer solution for your first & secure business with Korea.
> Buyer's Products Inquiry–If you feel difficult [sic] in finding products in Korea, please contact us. We will find products with good conditions at your site. *Contact Us!!*

Fellheimer Affidavit ¶ 8 and Exhibit D.

14. On or about September 2001, defendants replaced this web content with a new site that they described as a "world business contents portal web site" and a "business contents bank portal web site like Yahoo." The new page invites visitors to choose from a variety of categories of information such as "Accounting", Consulting", "Business Services", "Economics", "Investing", "Marketing", "Industry", "Insurance", "International Business and Trade", and "Venture Capital", among others. The web site does not contain any message disclaiming an affiliation, connection or association with plaintiff. Fellheimer Affidavit ¶ 9–10 and Exhibit E.

15. The categories of information identified in paragraph 14 fall within the classes covered by plaintiff's trademark registration. Fellheimer Affidavit ¶ 10.

16. As of January 11, 2002, defendants had replaced the content on their site with links to embassies, consulates and government agencies of various countries under the title "World Government Guide Opened on November 03, 2001 afresh!" Affidavit of Jeffrey Eichen in Further Support of Summary Judgment, Exhibit A.

17. Defendants have also established a site using the BIZBANK market and the country-code Top Level Domain ("TLD") for Korea, "kr" <http://www.biz-bank.co.kr>. At this site a buyer can make inquiries and purchase chemical membranes, "bio-ceramic" powder, "bio-ceramic" magnetic products, and other raw materials and finished goods from automobile parts to textiles to children's toys. Fellheimer Affidavit ¶ 11.

18. As a result of defendants' actions, plaintiff has been denied use of its federally registered, incontestable mark as a web address. Fellheimer Affidavit ¶ 12.

## IV. *CONCLUSIONS OF LAW AND DISCUSSION*

### A. TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION (COUNTS 1 & 2)

Count I of the Complaint alleges a violation of Section 32 of the Lanham Act. 15

U.S.C. § 1114. Section 32 protects owners of registered trademarks. It provides:

(1) Any person who shall, without consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion ...

shall be liable in a civil action by the registrant

15 U.S.C. § 14.

Count II of the Complaint alleges a violation of Section 43(a) of the Lanham Act. 15 U.S.C. § 1125. Section 43(a) governs claims of unfair competition. It provides:

(a)(1) Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false description of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125.

◼ The Third Circuit has held that to establish trademark infringement and unfair competition under the Lanham Act (Counts I and II), plaintiff must prove:

(a) it owns the mark in dispute;

(b) the mark is valid and legally protectable; and

(c) defendant's use of the mark to identify goods or services is likely to create confusion.

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 279 (3d Cir.2001). This inquiry applies identically to claims involving registered and unregistered marks when the unregistered mark is distinctive. *Villanova Univ. v. Villanova Alumni Educational Foundation* 123 F.Supp.2d 293, 301 (E.D.Pa.2000). As will be discussed in section (c)(ii)(a) *infra,* the Court concludes that BIZBANK is a distinctive mark. Therefore, the Court will analyze plaintiff's Counts I and II together.

### (a) Ownership and (b) Validity

◼ "If the mark at issue is federally registered and has become incontestable, then validity, legal protectability and ownership are proved." *Checkpoint Sys., Inc.,* 269 F.3d 270 at 280 (quoting *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.,* 214 F.3d 432, 438 (3d Cir. 2000)). "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five years, and that there is no pending proceeding and that there has been no adverse decision concerning the registrant's ownership or right to registration." *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 472 n. 7 (3d Cir.1994). The affidavits referred to by the *Fisons* court are required by 15 U S.C. § 1065.

Plaintiff has submitted an affidavit containing the required facts. Fellheimer Affidavit ¶¶ 2, 3 and 4, and has includes a copy of the federal registration certificate, *Id.* at Exhibit A. Thus, the Court concludes ownership and validity are established.

**(c) Likelihood of confusion**

To prove the likelihood of confusion, plaintiffs must show that "consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978). The Third Circuit considers ten factors ("*Lapp* factors") in determining whether a defendant's use of a mark is likely to cause confusion:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of functions; and

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market or that he is likely to expand into that market.

*Checkpoint Sys., Inc.*, 269 F.3d 270 at 280 (citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir.1983)). No one factor is determinative, as the inquiry is one of balancing, *Checkpoint Systems, Inc.*, 269 F.3d 270, 280, and "not all factors will be relevant in all cases ... the different factors may properly be accorded different weights depending on the particular factual setting." *Id.* (quoting *A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215 (3d Cir.2000)). The Court will address each of the *Lapp* factors in turn.

*(1) Similarity of the Marks*

In *Checkpoint*, the Third Circuit summarized the inquiry into similarity of marks for the purpose of a trademark infringement claim:

The single most important factor in determining likelihood of confusion is mark similarity ... In applying the test, courts attempt to 'move into the mind of the roving consumer, and determine whether the labels create the same overall impression when viewed separately.' Courts must compare the appearance, sound and meaning of the marks, to determine whether the average consumer, on encountering one mark in isolated circumstances of marketplace and having only a general recollection of the other, would likely confuse or associate the two ... But mark similarity is not necessarily determinative of likely confusion, particularly when the products do not directly compete.

*Checkpoint Sys., Inc.*, 269 F.3d 270 at 281 (internal citations omitted).

Plaintiff argues that defendants' mark is "not just similar, but identical" to its own for the purpose of satisfying the first *Lapp* factor. Although defendants' corporate name is "Biz Bank," its web address <http://www.bizbank.com> does not contain a space between "biz" and "bank." Moreover, web addresses are not case-sensitive. These facts demonstrate that plaintiff's "BIZBANK" and defendants'

<http://www.bizbank.com> are identical or nearly identical. Thus, the Court concludes that the first *Lapp* factor—similarity of the marks—weighs in favor of finding a likelihood of confusion.

*(2) Strength of the Mark*

"The strength of a mark is determined by (a) the distinctiveness or conceptual strength of the mark and (b) its commercial strength or marketplace recognition." *Checkpoint Sys., Inc.,* 269 F.3d 270, 282 (citing *Fisons,* 30 F.3d at 478–79).

*(a) Distinctiveness and Conceptual Strength*

■ Distinctiveness is determined by analyzing a mark in terms of four trademark classifications: arbitrary, suggestive, descriptive and generic. *A & H Sportswear,* 237 F.3d at 221. The Third Circuit has defined these categories as follows:

> Arbitrary or fanciful marks "use terms that neither describe nor suggest anything about the product they 'bear no logical or suggestive relation to the actual characteristics of the goods.'" [E.g. "kodak"]
>
> Suggestive marks "require consumer 'imagination, thought or perception' to determine what the product is." [E.g. "coppertone"]
>
> Descriptive marks " 'forthwith convey an immediate idea of the ingredients, qualities or characteristics of the goods'" [E.g. "security center"]
>
> Generic marks " 'function as the common descriptive name of a product class.'" [E.g. "diet chocolate fudge soda"]

*Id.*, (quoting *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296–97 (3d Cir.1986)); *Pep Boys Manny, Moe & Jack,* 1 2002 WL 524001 at *5 (provides examples); *see also,*

*Ford Motor Co. v. Summit Motor Prods.,* 930 F.2d 277, 292 (3d Cir.1991) (further explaining the categorization of marks). Arbitrary and suggestive marks, along with descriptive marks that have a demonstrated secondary meaning, are entitled to trademark protection. *A & H Sportswear,* 237 F.3d at 221. Marks that are generic or descriptive without a secondary meaning do not receive protection. *Id.* In paragraph 6, Findings of Fact, the Court found that BIZBANK is a descriptive mark with a secondary meaning.[3] Thus, it is entitled to trademark protection. *Id.* at 221.

Plaintiff does not address the four above identified categories of marks and instead argues that BIZBANK is distinctive because plaintiff has federally registered the mark. Plaintiff's assertion that federal registration establishes the strength of a mark erroneously equates qualification for trademark protection with distinctiveness. As the Third Circuit explained in *A & H Sportswear:*

> Under the Lanham Act, stronger marks receive greater protection. Although the conceptual strength of a mark is often associated with the particular category of 'distinctiveness' into which a mark falls (i.e., arbitrary, suggestive, or descriptive), that is not the only measure of conceptual strength. This is because the classification system's primary purpose is to determine whether the mark is protectable as a trademark in the first place—that is, to determine whether consumers are likely to perceive the mark as a signifier of origin, rather than as a mere identification of the type of product. The classification of a mark as arbitrary, suggestive, or descriptive is only secondarily used to determine the degree of protection a mark should receive once protect-

---

**3.** Level of distinctiveness and mark strength are factual determinations. *See Ford Motor*

*Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 292 n. 18 (3d Cir.1991).

ability has been established. These two inquiries—whether a mark is, in fact, a trademark, versus how much protection the mark should receive—are often identical, but they do not have to be.

Suggestive or arbitrary marks may, in fact, be 'weak' marks, particularly if they are used in connection with a number of different products ... Thus, the classification of a mark as 'descriptive' or 'arbitrary' for the purpose of determining whether it receives trademark protection at all—though a useful guide in assessing the strength or weakness of a mark—is not dispositive.

237 F.3d at 222.

The Court concludes plaintiff has introduced evidence that the mark is distinctive but has not introduced sufficient evidence to enable the Court to determine the conceptual strength of the mark. Thus, the Court will turn to the commercial strength or marketplace recognition of the mark to determine the overall strength of the mark.

(b) *Commercial Strength or Marketplace Recognition*

"Commercial strength or marketplace recognition of the mark looks to factual evidence of marketplace recognition.'" *A & H Sportswear, Inc.*, 237 F.3d at 221. "[C]ourts must look at the strength of the mark in the industry in which infringement is alleged." *Checkpoint Sys., Inc.*, 269 F.3d at 284. "Indications of commercial strength include the level of public recognition of the mark and the amount of money spent on advertisement and promotion." *Pep Boys Manny, Moe & Jack*, 2002 WL 524001 at *5 (citing *A & H Sportswear*, 237 F.3d at 210).

Plaintiff asserts that the BIZBANK mark has been in use in the United States for over ten years, and that its "customers and vendors know of the mark BIZBANK as indicating Pennsylvania Business

Bank's identity and services." Fellheimer Affidavit ¶ 12. In addition, plaintiff introduces evidence that other commercial entities, outside the Philadelphia metropolitan area, have acknowledged plaintiff's ownership of the mark. Fellheimer Affidavit ¶ 6. Specifically, in 2001 plaintiff entered into a non-exclusive licensing agreement with the Cambridge Trust Company in which Cambridge Trust acknowledged plaintiff's ownership of the BIZBANK mark, paid plaintiff a royalty for its use of the mark and agreed to submit for plaintiff's approval any materials containing the mark. *Id.* Defendants express skepticism about the scope of recognition of the mark but offers no evidence on the subject.

The Court concludes that plaintiff has introduced sufficient facts to establish marketplace recognition of the mark as indicating Pennsylvania Business Bank's identity and services. In sum, the second *Lapp* factor—strength of the mark—weighs in favor of finding a likelihood of confusion.

(3) *Care and Sophistication of the Consumers*

"When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion. Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." *Checkpoint Sys., Inc.*, 269 F.3d 270, 284.

Plaintiff argues that the level of care of Internet users is generally low, and that it is common for them to search for a business by simply adding ".com" TLD to the business name which in this case takes them to defendants' website. Defendants do not address the issue.

Plaintiff may be correct in its conclusion that Internet shoppers are relatively careless when "surfing" for products, but it is not clear that arriving at plaintiffs website and actually purchasing a product (if one could purchase a product on the current version of defendants' website) are the same thing for the purpose of this analysis. *Network Network v. CBS, Inc.,* 2000 WL 362016 (C.D.Cal.2000) (granting declaratory judgment of noninfringement in part because there "is a difference between inadvertently landing on a website and being confused.").

Moreover, plaintiff's definition of its consumers as Internet users is not as accurate as identifying them as online banking customers. In *Pep Boys Manny, Moe & Jack,* another court in this district concluded that ordinary purchasers of automobile tires did exercise special care for the purpose of limiting the likelihood of product confusion. 2002 WL 524001 at *7. The Court concludes that on-line banking customers exercise at least as much caution as individuals purchasing tires. Thus, the Court finds that the third *Lapp* factor—care and sophistication of the consumer—weighs against plaintiff's allegation of confusion.

### (4) Duration of Defendant's Use of the Mark Without Evidence of Actual Confusion

Plaintiff has not submitted any evidence of actual confusion. However, for the reasons outlined in its discussion of the sixth *Lapp* factor—evidence of actual confusion—the Court concludes that this factor neither favors nor disfavors finding a likelihood of confusion.

### (5) Intent of Defendant

"[C]ourts have recognized that evidence of 'intentional, willful and admitted adoption of a mark closely similar to the existing marks' weighs strongly in favor of finding the likelihood of confusion," *Check-*

*point Sys., Inc.,* 269 F.3d 270, 286 (quoting *National Football League Props., Inc. v. New Jersey Giants, Inc.,* 637 F.Supp. 507, 518 (D.N.J.1986)), but that "it is neither a prerequisite nor, by itself without more, sufficient to prove a Lanham Act violation." *Pep Boys Manny, Moe & Jack,* 2002 WL 524001 at *8. Intent is relevant for the test only if it constitutes a "purposeful manipulation of the junior mark to resemble the senior's." *A & H Sportswear,* 237 F.3d at 226.

Plaintiff argues that defendants exhibited bad faith by registering their domain name with the TLD ".com" which, according to plaintiff, gives the impression that it is located in the United States. In addition, plaintiff claims that bad faith is established by defendants' failure to investigate whether the mark BIZBANK was registered in the United States. *Id.* Addressing bad faith in their proposed conclusions of law as to Count III, plaintiff argues that previous versions of <http://www.bizbank.com> reveal defendants' true intent to use the site to advertise their export services and that the current version of the website with non-commercial information on embassies and consulates around the world was developed solely for the purpose of this litigation and thus evidences bad faith.

In response to plaintiffs suggestion that use of the ".com" TLD is deceiving, defendants argue that "com" is an international domain that can be used and registered by any person and any company in the World. In support of this claim, defendants submitted a document that offers some explanation as to the difference between a ".com", domain name and a country-specific domain name, and a list showing that every country has its own national TLD, including ".us" for the United States. Won Affidavit, Exhibits B, C, D, E and F.

As another court in this district has noted, both ".com" and " .org" TLD's are "unrestricted [and] generic." *Chatam Int'l, Inc.* 157 F.Supp.2d 549 at n. 15. While many people may associate ".com" websites with the United States, plaintiff has submitted no evidence to substantiate this claim. In addition, there is no authority for plaintiff's claim that bad faith is established by defendants' failure to investigate the BIZBANK mark before they registered the <http://www.bizbank.com> domain name. However, the Court finds plaintiff's arguments about the various versions of the website convincing and concludes that defendants' behavior raises an inference of bad faith. Thus, the fifth *Lapp* factor—intent of the defendants— weighs in favor of finding a likelihood of confusion.

### (6) Evidence of Actual Confusion

Evidence of actual confusion is not required, but may be "highly probative" of a Lanham Act violation because it is difficult to find. *Checkpoint Sys., Inc.,* 269 F.3d 270, 291. The Third Circuit has found that, in addition to "actual confusion," "initial interest confusion" is actionable under the Lanham Act. *Checkpoint Sys. Inc.,* 269 F.3d 270, 295–96. "[Initial interest] confusion ... occurs when a consumer is lured to a product by its similarity to a known mark, even though the consumer realizes the true identity and origin of the product before consummating a purchase." *Id.* (quoting *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 464 (7th Cir. 2000)). *See also, Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1057 (9th Cir.1999) (discussing initial interest confusion in a Lanham Act case involving an Internet website); *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 260 (2d Cir. 1987) ("without initial interest protection, an infringer could use an established mark to create confusion as to a product's source

thereby receiving a 'free ride on the good-will' of the established mark."); *Chatam International, Inc. v. Bodum, Inc.* 157 F.Supp.2d 549, 558 (E.D.Pa.2001) ("initial interest confusion, factually and legally, is the gravamen of the broader problems presented by the exclusivity of domain names"), 3 McCarthy on Trademark and Unfair Competition 23:6 (4th ed.2000) ("initial interest confusion can be viewed as a variation on the practice of the 'bait and switch.' ").

Plaintiff has not submitted any evidence of actual confusion. However, plaintiff argues that evidence of confusion is "at best, ambiguous" since Internet visits are short-lived and unreported, so that these factors neither favor nor disfavor a likelihood of confusion. Defendants do not address the issue.

Given the fact that plaintiff's domain name is identical to plaintiff's mark, the Court finds that consumers, in all likelihood, will visit defendant's website while searching for plaintiff and thus may experience "initial interest confusion". Thus, the Court concludes the sixth *Lapp* factor—evidence of actual confusion—weighs in favor of finding a likelihood of confusion.

### (7) Same Marketing Channels and Advertising Media

"These factors relate to how likely the buyers and users of each party's products are to encounter the goods of the other. To the extent parties overlap in their promotional means, the greater the likelihood of confusion may be." *Pep Boys Manny, Moe & Jack,* 2002 WL 524001 at *1. "[C]ourts must examine the trade exhibitions, publications and other media the parties use in marketing their products as well as the manner in which the parties use their sales forces to sell their products to consumers." This is a fact intensive

inquiry. *Checkpoint Sys., Inc.*, 269 F.3d 270, 289.

It is undisputed that both parties are using the mark in the same channel of communication-the Internet. At least one marketing channel for the parties therefore overlaps. According, the Court finds the seventh *Lapp* factor—same marketing channels and advertising media—weighs in favor of finding a likelihood of confusion.

### (8) Same or Different Target Audiences

The Third Circuit has recognized that "when parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion. This analysis too is intensely factual." *Checkpoint Sys., Inc.*, 269 F.3d 270, 289 (internal citations omitted).

Plaintiff categorizes its target audience as "people who are using the Internet to gather information about or communicate with a potential vendor" in order to conclude that the audience for their and defendant's sites are exactly the same. This description is unacceptable because it would apply to anyone who has ever used the Internet for commercial reasons. More realistically, plaintiff's target audience can be described as consumers seeking online banking services or financial information.

Depending on which version of defendant's site is being considered, plaintiff's and defendants' audiences can be seen as drastically different (in the instances of defendants' site selling Korean goods or offering information about world governments), or somewhat overlapping (in the short-lived instance of the site offering financial information). On this issue, defendants argue that even when the site contained commercial information they were not targeting the same audience as plaintiff because they never had any American customers. Won Affidavit ¶ 2.

Because defendants have in the past marketed services similar to those offered by plaintiffs and may do so again and because the World Wide Web offers global exposure, including exposure to customers in the United States, the Court concludes the eighth *Lapp* factor—same or different target audiences—weighs in favor of finding a likelihood of confusion.

### (9) Product Similarity

"Under this prong, courts examine whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or sponsorship.... The test is whether the goods are similar enough that a customer would assume they were offered by the same source." *Checkpoint Sys., Inc.*, 269 F.3d 270 at 286 (citations omitted).

Analysis of this factor depends on which version of defendants' site is being considered. The current incarnation of <http://www.bizbank.com> provides information completely distinct from the line of business plaintiff operates. However, at one time the site advertised services such as "investing", "insurance" and "venture capital" which are the same services offered by plaintiff. There is nothing to prevent defendants from returning to this version of the website. Consequently, the Court concludes the ninth *Lapp* factor—product similarity—favors finding a likelihood of confusion.

### (10) Other Factors

There are no other significant factors to be discussed.

In sum, the *Lapp* factors that weigh in favor of plaintiffs claim of confusion are: (1) similarity of the marks; (2) strength of the mark; (5) intent of defendant; (6) evidence of actual "initial interest" confusion; (7) same marketing channels and

advertising media; (8) target audience; and (9) product similarity. The other relevant factors: (3) care and sophistication of the consumers; and (4) duration of defendant's use of the mark without evidence of actual confusion, either weigh in favor of defendants or neither favor nor disfavor finding a likelihood of confusion. Weighing these various factors, the Court concludes that there is a likelihood of confusion.

Plaintiff has proven by a preponderance of the evidence that it owns the mark in dispute; the mark is valid and legally protectable; and that defendant's use of the mark to identify goods or services is likely to create confusion. Thus, defendants use of the mark BIZBANK as an internet domain name at <http://www.biz-bank.com> infringes on plaintiff's trademark and constitutes unfair trade practices in violation of 15 U.S.C. §§ 1114(a)(1) and 1125. Accordingly, the Court finds for plaintiff on Counts I and II of the Complaint.

## B. CYBERSQUATTING (Count Three)

On November 29, 1999 Congress passed the Anticybersquatting and Consumer Protection Act ("ACPA"). This law makes it illegal to register or use with the bad faith intent to profit an Internet domain name that is "identical or confusingly similar" to the trademark or domain name of another person or company. 15 U.S.C. § 1125(d). "The Act was intended to prevent 'cybersquatting,' an expression that has come to mean the bad faith, abusive registration and use of the distinctive trademarks of others as Internet domain names, with the intent to profit from the goodwill associated with those trademarks." *Shields v. Zuccarini,* 254 F.3d 476 (3d Cir.2001).

■ The ACPA provides in relevant part:

A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person

(I) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that-

(1) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark.

15 U.S.C. 1125(d)(1)(A) (Supp.2000). As interpreted by the Third Circuit, the statute requires plaintiff to prove the following elements in order to succeed in a claim under the ACPA:

(a) the mark is a distinctive or famous so that it is entitled to protection;

(b) defendant's domain names are "identical or confusingly similar to" plaintiffs mark; and

(c) defendant registered the domain name with the bad faith intent to profit from it.

*Shields,* 254 F.3d 476, 482.

### (a) Distinctive or Famous

[11] The APCA enumerates seven factors to consider when determining whether a mark is sufficiently distinctive or famous to warrant protection:

(1) the degree of inherent or acquired distinctiveness of the mark;

(2) the duration and extent of use of the mark in connection with the goods or services with which the mark was used;

(3) the duration and extent of advertising and publicity of the mark;

(4) the geographical extent of the trading area in which the mark is used;

(5) the channels of trade for the goods or services with which the mark is used;

(6) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; and

(7) the nature and extent of the use of the same or similar marks by third parties.

15 U.S.C. 1125(c)(1).

Plaintiff has submitted evidence relating to factors (1), (2), (3), (4), (5) and (6). As to factor (1), the Court notes that the mark is distinctive for the reasons set in section III(A)(c)(2) *supra*. As to factors (2) and (3) plaintiff has offered evidence that the mark has been in use for at least 10 years. As to factors (4) and (6) plaintiff has offered evidence that its "customers and vendors know of the mark BIZBANK as indicating Pennsylvania Business Bank's identity and services", Fellheimer Affidavit ¶ 12, and that a financial institution in Cambridge, Massachusetts has sought to license the mark, *Id.* at ¶ 6. As to factor (5), plaintiff has offered evidence that defendants, at one time, advertised banking and financial services on their website similar to services offered by plaintiff. On the basis of these facts, the Court concludes that BIZBANK is a distinctive mark for the purposes of the APCA.

**(b) Identical or Confusingly Similar**

█ This prong of the test refers to the domain name itself, not the likelihood of confusion by consumers. *Shields,* 254 F.3d 476, 483. Defendants' domain name <http://www.bizbank.com> is identical to plaintiff s BIZBANK mark. Thus, the Court concludes that defendants' domain name is identical or confusingly similar to plaintiff's mark.

**(c) Bad Faith**

█ In determining whether a party has displayed bad faith under the APCA, a court may the following non-exclusive list of factors:

(1) the trademark or other intellectual property rights of the person, if any, in the domain name;

(2) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(4) the person's *bona fide* noncommercial or fair use of the mark in a site accessible under the domain name;

(5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(7) the person's provision of material and misleading false contact infor-

mation when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(9) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C. § 1125(d)(1)(B)(I).

As to factor (1), defendant's website at <http://www.bizbank.com> has plaintiff's mark in its domain name. As to factor (4), the plaintiff argues that the current noncommercial use of the website—to provide "world government information"—is not a bona fide noncommercial use but rather raises an inference of bad faith. As to factor (5), plaintiff argues that defendants' prior version of the website offering their export services, including financial services similar to those offered by plaintiff, evidences their true intent for the site. Apart from these factors, plaintiff also argues bad faith on the grounds that defendants' use of the ".com" TLD is deceptive and that defendants had a duty to investigate American registration of the mark before using it for its website.

The Court finds plaintiff's arguments about the various versions of the website convincing and concludes that defendants' behavior raises an inference of bad faith. For the reasons given above, plaintiff's

arguments that the use of ".com" TLD and defendants duty to investigate their domain name are not supported in fact or law. Thus, the Court concludes that plaintiff has established bad faith on the part of defendants.

In sum, the Court concludes that plaintiff has proven by a preponderance of the evidence that BIZBANK is a distinctive or famous mark so that it is entitled to protection; that defendants' domain name <http://www.bizbank.com> is identical or confusingly similar to plaintiff's mark; and that defendants registered the domain name with the bad faith intent to profit from it. Thus, defendants use of the mark BIZBANK constitutes cybersquatting in violation of 15 U.S.C. § 1125(d). Accordingly, the Court finds for plaintiff on Count III of the Complaint.

## V. REMEDY

 In their proposed findings of fact and conclusions of law, plaintiffs request the Court enjoin defendants from further use of the mark BIZBANK and require defendants to transfer the domain name <http://www.bizbank.com> to plaintiff pursuant to 15 U.S.C. §§ 1116 and 1125(d)(1)(C). The Court concludes that plaintiff's requested remedy is appropriate and enjoins the defendants from further use of the mark BIZBANK and orders defendants to immediately transfer or arrange to transfer the domain name <http://www.bizbank.com> to plaintiff. In the alternative, plaintiff is granted leave to submit to the Court a form of order providing for the transfer of the domain name by the Internet Corporation for Assigned Names and Numbers (ICANN).

## VI. CONCLUSION

Plaintiff has proven by a preponderance of the evidence that it owns the mark in dispute; the mark is valid and legally pro-

tectable; and defendant's use of the mark to identify goods or services is likely to create confusion. Thus, the Court finds in favor of the plaintiff on Counts I and II. In addition, plaintiff has proven by a preponderance of the evidence that BIZBANK is a distinctive or famous mark that is entitled to protection; that defendants' domain name <http://www.bizbank.com> is "identical or confusingly similar to" plaintiff's mark; and that defendants registered the domain name with the bad faith intent to profit from it. Thus, the Court finds in favor of plaintiff on Count III. The Court enjoins defendants from further use of the mark BIZBANK and requires defendants to immediately transfer or arrange to immediately transfer the domain name <http://www.bizbank.com> to plaintiff pursuant to 15 U.S.C. §§ 1116 and 1125(d)(1)(C).

An appropriate order follows.

### *ORDER*

**AND NOW,** this 6th day of August, 2004, this case having been presented to the Court for decision pursuant to the Order dated November 6, 2003, and related Orders, and the Court having reviewed all of the evidence submitted by the parties, based on the attached Findings of Fact and Conclusions of Law, the Court **FINDS IN FAVOR** of plaintiff, Pennsylvania Business Bank, and **AGAINST** defendants, Biz Bank Corp., and Daemin Won, and **JUDGMENT IS ENTERED** in **FAVOR** of plaintiff, Pennsylvania Business Bank, and **AGAINST** defendants, Biz Bank Corp., and Daemin Won.

**IT IS FURTHER ORDERED** that defendants, Biz Bank Corporation and Daemin Won, are **PERMANENTLY ENJOINED** from further use of the mark "BIZBANK" in defendants' domain name, and defendants shall **IMMEDIATELY TRANSFER, OR ARRANGE FOR THE IMMEDIATE TRANSFER** of, the domain name <http://www.bizbank.com> to plaintiff. In the alternative, plaintiff is **GRANTED LEAVE** to submit to the Court a form of order providing for the transfer of the domain name by the Internet Corporation for Assigned Names and Numbers (ICANN).